UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
TECH+IP ADVISORY, LLC,

                Plaintiff,

        - against –

BLACKBERRY LIMITED,

              Defendant.

------------------------------X

                         **MEMORANDUM AND ORDER**
                          23 Civ. 5996 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      Tech+IP Advisory, LLC ("Tech+IP" or "plaintiff") brings this action against Blackberry Limited ("Blackberry" or "defendant") concerning a transaction fee plaintiff alleges that it is owed for facilitating the purchase of defendant's patent assets by Malikie Innovations Ltd. ("Malikie"). Presently before the Court is defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis that any oral modification is barred by both Section 5-701(a)(1) of the New York Statute of Frauds and a contractual provision prohibiting any oral modifications to the agreement, and that the email exchange relied on by plaintiff does not satisfy the Statute of Frauds writing requirement. For the following reasons, defendant's motion is granted.

BACKGROUND[1]

## A.    Factual Background

Tech+IP is a firm that provides strategic advisory services for transactions relating to advanced technology and patents.  FAC ¶ 15.  BlackBerry is a global technology company.  Id. ¶ 14.  On May 4, 2020, the parties entered into a written letter agreement, pursuant to which Tech+IP agreed to serve as BlackBerry's "exclusive external advisor in connection with the possible sale, distribution, transfer, assignment, license, or other disposition . . . of all or substantially all of [Blackberry's] patent licensing business."  FAC ¶ 16; FAC, Ex. 1 (the "Agreement") § 1. As compensation for its services, Tech+IP would be entitled, upon closing, to a certain percentage of the value of a qualifying transaction.  See Agreement § 2.  The Agreement had a term of twelve months, as well as an additional twelve-month tail period during which time Tech+IP would still be entitled to a transaction fee if a qualifying transaction closed.  Id. § 2.  Of particular relevance here, the Agreement contained a clause that prohibited oral modifications.  Agreement § 7 ("This Agreement may not be

---

[1] Unless otherwise noted, the facts considered and recited here for purposes of the instant motion to dismiss are drawn from plaintiff's First Amended Complaint and are accepted as true, taking all reasonable inferences in plaintiff's favor. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995).

amended . . . except in a writing duly executed by the parties hereto.").

Throughout 2020 and 2021, Tech+IP identified and contacted over fifty potential buyers, sixteen of which executed non-disclosure agreements in order to receive "extensive information" about BlackBerry's patent portfolio.  FAC ¶¶ 26-29.  The potential buyers, or "Contacted Parties," included, among others, Catapult IP Innovations, Inc. ("Catapult") and Key Patent Innovations Ltd. ("KPI").  Id. ¶¶ 32, 35.  Tech+IP ultimately presented four offers to BlackBerry's management and board in late December 2020, including offers from Catapult and KPI.  Id. ¶¶ 33, 35.

The original term of the Agreement expired on May 4, 2021, and the original tail period expired on May 4, 2022.  Id. ¶¶ 23-24.  However, by December 2021, BlackBerry's patent assets had not sold.  Id. ¶ 39.  Accordingly, on December 20, 2021 (over seven months after the original term of the Agreement had expired, but while the original tail period was still in force), the parties entered into a signed, written amendment on Tech+IP's stationary extending the term of the Agreement.  ECF No. 22-2 (the "Amended Agreement"); FAC ¶ 39.  Specifically, the Amended Agreement stated:

> In Section 1, paragraph 6 of the Agreement, replace "This Agreement shall have a term of twelve (12) months (the "Engagement Term") subject to earlier termination …." with "This Agreement shall have a term (x) of twelve (12) months, or (y) with respect to the sale of

-3-

substantially all of the non-core patents of the Company to Catapult IP Innovations, Inc. or any of its affiliates, ending on June 30, 2022 (the period set forth in (x) or (y), as applicable, the "Engagement Term"), subject to earlier termination …."

In Section 2, paragraph 7 of the Agreement, replace "If this Agreement expires or is terminated for any reason by the Company (and not by TIPA, solely for convenience), and the Company (and/or any of its subsidiaries) closes a Transaction with one of the Contacted Parties (as defined below) prior to the date that is twelve (12) months after such expiration or termination (the "Tail Period")…" with "If this Agreement expires or is terminated for any reason by the Company (and not by TIPA, solely for convenience), and the Company (and/or any of its subsidiaries) closes a Transaction with one of the Contacted Parties (as defined below) prior to December 31, 2022 (the "Tail Period")…"

Amended Agreement § 1.[2]  Additionally, the Amended Agreement emphasized that all other terms of the Agreement remained unchanged, reiterating that any amendment must be made "in a writing duly executed by the parties."  Id. § 2; FAC ¶¶ 39-41.

On January 31, 2022, BlackBerry announced that it had accepted a $600 million bid from Catapult.  Id. ¶ 42.  Tech+IP continued to provide services throughout 2022 in connection with the Catapult transaction, which included "numerous presentations to potential financiers . . . and supporting . . . due diligence."  Id. ¶¶ 43,

---

[2] The parties disagree as to the scope of this extension.  BlackBerry takes the position that the extension of both the term of the Agreement and tail period applied only to a transaction with Catapult or its affiliates, while Tech+IP contends that the extension of both the term and the tail period applied to a transaction with any Contacted Party.  Oral Argument at 3:20 - 5:8.

45.    Because the Catapult transaction still had not closed by October 2022, Tech+IP alleges that it began engaging in discussions with backup buyers, including KPI's financing partner.  Id. ¶¶ 51-52.

On December 29, 2022 and December 30, 2022, Tech+IP's co-founder had a telephone conversation with the Chief Financial Officer of BlackBerry, Steve Rai, to discuss the status of the Catapult transaction.  Id. ¶ 56.  Plaintiff alleges that its co-founder and Mr. Rai "discussed further extending the Agreement to cover" Tech+IP's work and that Tech+IP "specifically noted" that any extension must cover transactions closed with any buyer, not just Catapult.  Id. ¶¶ 57, 58.  According to plaintiff, Mr. Rai "agreed" during that conversation that such an extension "made sense."  Id. ¶ 59.  Tech+IP's co-founder subsequently emailed Mr. Rai with a "[q]uick [u]pdate," describing the work being done to finalize the Catapult transaction and stating that the Tech+IP team was "all invested in this, and as discussed are fine operating on the understanding that our engagement has been extended until this can occur."  ECF No. 44-2.  Tech+IP indicated that it would strive to complete the Catapult transaction in four to six weeks, to which Mr. Rai responded noting that "urgency is very much needed in this last mile" and that the work "[m]ust get . . . done within 4 weeks (not 6)."  Id.; FAC ¶¶ 61-63.

Plaintiff alleges that defendant continued to request its services through March 2023. Id. ¶¶ 71, 75, 78, 81, 104. These included BlackBerry's request for a status update, id. ¶ 67, and Tech+IP's leadership of or participation in "more than 110 telephonic or online meetings," id. ¶ 71. However, in mid-March 2023, Tech+IP learned from BlackBerry's outside counsel that BlackBerry had terminated the Catapult deal. Id. ¶ 83. On March 21, 2023, BlackBerry announced that it intended to sell its patents to Malikie, a subsidiary of KPI, a party that had been introduced to BlackBerry by Tech+IP. Id. ¶ 91. This transaction closed on May 11, 2023. Id. ¶ 92.

On May 16, 2023, Tech+IP sent Blackberry an invoice totaling $1,325,000, which reflected the transaction fee plaintiff calculated it was owed at that time. Id. ¶ 97. The next day, Blackberry rejected the invoice. Id. ¶ 99. This litigation ensued.

## B.  **Procedural History**

On June 9, 2023, plaintiff commenced this action in the Supreme Court for the State of New York by filing a Summons with Notice. See Tech+IP Advisory, LLC v. BlackBerry Ltd., Index No. 652808/2023 (N.Y. Sup. Ct.). On June 21, 2023, defendant filed a demand for the complaint, and on July 11, 2023, plaintiff served the original complaint on defendant. Id. The next day, BlackBerry

removed the action to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332.  ECF No. 1.

On October 10, 2023, the Court held a pre-motion conference regarding defendant's anticipated motion to dismiss.  The Court granted defendant leave to bring its motion.  In doing so, the Court also granted plaintiff leave to file an amended complaint within two weeks of the conference, suggesting that, if it should decide to do so, plaintiff focus on addressing the Statute of Frauds issues raised in the parties' pre-motion letters.  ECF Nos. 15, 20.  On October 23, 2023, plaintiff filed an amended complaint. ECF No. 23 ("First Amended Complaint" or "FAC").

BlackBerry moved to dismiss plaintiff's First Amended Complaint on November 15, 2023.[3]  ECF Nos. 27, 28 ("Mot."), 29-31. On December 7, 2023, Tech+IP filed its opposition, ECF No. 34 ("Opp."), and on December 22, 2023, BlackBerry filed its reply, ECF No. 39 ("Reply").  Oral argument was held on August 8, 2024. See ECF No. 46 ("Oral Argument").

---

[3] On August 4, 2023, the parties jointly filed a letter seeking permission to file portions of the complaint relating certain pricing information and the terms of plaintiff's services under seal.  ECF No. 11.  The Court granted this request for "limited relief."  ECF No. 12.  Pursuant to this order, the parties filed their motion to dismiss papers with significant portions under seal, including information critical to plaintiff's claims.  As the Court informed the parties at oral argument, only non-public information concerning third parties will remained sealed.  Accordingly, the parties are directed to refile the First Amended Complaint and the attachments thereto, as well as the motion to dismiss briefing, redacting only references to non-public information involving third parties, within two weeks of the filing of this Memorandum and Order.

**LEGAL STANDARD**

To defeat a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the [pleaded] fact[s] . . . allow[ ] the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." Id.  A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  Acticon AG v. China N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012).  However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

**DISCUSSION**

Plaintiff asserts four causes of action against defendant, namely, (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) unjust enrichment; and (4) quantum meruit.  FAC ¶¶ 102-130.  Defendant seeks dismissal of all of plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6). We will address each of these claims in turn.

**A.    Breach of Contract Claim**

Plaintiff bases its breach of contract claim on an alleged extension of the Agreement.  Defendant moves to dismiss this claim on the ground that the Agreement is covered by New York's Statute of Frauds (or, the "Statute") and that plaintiff has failed to plead any exceptions.  We turn first to the applicability of the Statute of Frauds.

**1. Section 5-701(a)(10) of the Statute of Frauds Applies to the Agreement**

Under the New York Statute of Frauds, certain contracts are "void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent."  N.Y. Gen. Oblig. Law § 5-701(a).  "The primary function of the Statute of Frauds is an evidentiary one; it is intended to 'guard against the peril of perjury' and 'prevent the enforcement of unfounded fraudulent claims' by limiting the range of evidence permitted to prove the existence of an agreement that lacks a formal writing."  Zhi Zhong Qiu v. Diamond, No. 19 Civ. 2050 (ER), 2020 WL 978352, at *4 (S.D.N.Y. Feb. 27, 2020) (quoting Springwell Corp. v. Falcon Drilling Co., 16 F. Supp. 2d 300, 304 (S.D.N.Y. 1998) (Sotomayor, J.)).

Pursuant to Subdivision 10 of the Statute, "a contract to pay compensation for services rendered . . . in negotiating the purchase . . . of a business," such as broker agreements and

finder's fees, is covered by the Statute.[4]  N.Y. Gen. Oblig. Law § 5-701(a)(10).  The Statute defines "negotiating" to include both "procuring an introduction to a party to the transaction" and "assisting in the negotiation or consummation of the transaction." Id.  "Section 5-701(a)(10) is a broad umbrella that includes the use of 'connections,' 'ability' and 'knowledge' to facilitate or assist in the transaction by helping the acquirer of the business opportunity meet the right people and have the right information." Ely v. Perthuis, No. 12 Civ. 1078 (DAB), 2013 WL 411348, at *3 (S.D.N.Y. Jan. 29, 2013) (internal quotation marks and citation omitted); see also Caro Cap., LLC v. Koch, 20 Civ. 6153 (LJL), 2022 WL 463338, at *9 (S.D.N.Y. Feb. 14, 2022) ("The relevant inquiry is the scope of activities included in the plaintiff's

---

[4] Section 5-701(a)(10) states in full:

> (a) Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> (10) Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation but shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker or real estate salesman.

role; where the intermediary's activity is that of providing 'know-how' or 'know-who,' in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in an enterprise, the statute of fraud applies" (citation omitted)).  If services are "performed as part of or in furtherance of negotiation," they are "rendered in negotiating" for the purposes Section 5-701(a)(10).  JF Cap. Advisors, LLC v. Lightstone Grp., LLC, 25 N.Y.3d 759, 766 (2015) (emphasis in original).

Tech+IP contends that the "broad array of investment banking and advisory services" it provided BlackBerry remove the Agreement from the purview of the Statute of Frauds because they "transcend[ed] the limited role of serving as an intermediary." Opp. at 13-14 (citing Akerson Advert. & Mktg., Inc. v. St. John & Partners Advert. & Pub. Rels., Inc., 89 F. Supp. 3d 341, 350-51 (N.D.N.Y. 2015)).  Specifically, Tech+IP points to allegations that it: (1) was engaged as BlackBerry's "exclusive external advisor" in connection with a potential sale of its patent licensing business; (2) created marketing materials for BlackBerry's use; (3) analyzed and presented offers to BlackBerry;[5] (4) provided "in-depth analysis of the terms of potential deals to BlackBerry's management and board"; (5) "met with potential

---

[5] In this regard, Tech+IP fails to mention BlackBerry's outside counsel with whom it interacted on multiple occasions.  See FAC ¶¶ 83-84.

alternative purchasers and advised BlackBerry to consider backup transactions"; and (6) was actively involved in due diligence and "structuring of financial components of the deal."  Opp. at 14; FAC ¶¶ 16, 27, 33, 35, 43, 46, 66, 69-70.  Moreover, at oral argument, Tech+IP's counsel highlighted plaintiff's "work done vis-à-vis valuation . . . [,] introduction . . . [,] PowerPoint, marketing materials, [and] roadshow-type activities" as activities constituting "a typical investment banking advisory services agreement . . .[,] not a typical brokerage . . . or a finder's fee agreement."  Oral Argument at 8:5-12.

Tech+IP also suggests that its work creating an investment vehicle in an attempt to "allow BlackBerry to indirectly invest capital into the Catapult transaction" to "close the financing gap" brought it outside of a typical finder's fee contract.  Opp. at 7; FAC ¶¶ 70-71.  However, oral argument, as well as the emails provided to the Court on August 6, 2024, revealed that Tech+IP in fact formed this entity so that Tech+IP <u>itself</u> could invest four to six million dollars in the Catapult transaction.  Oral Argument at 18:25 – 19:6.  Clearly, Tech+IP was motivated to do so in order to bridge the gap in financing that stood in the way of the consummation of the Catapult transaction, from which it stood to earn a fee in excess of its proposed investment.  See <u>Wolet Cap. Corp. v. Walmart Inc.</u>, No. 18 Civ. 12380 (LJL), 2021 WL 242297, at

\*6 (S.D.N.Y. Jan. 25, 2021) (noting that Section 701(a)(10) requires a writing based on the presumption that "there may be circumstances in which one party [gratuitously] identifies a business opportunity for another" in the hope that it ultimately will be retained on a contractual basis).

None of these services take plaintiff outside the Statute of Frauds.  "No matter what label plaintiff puts on the services rendered," the work described in the Agreement and alleged in the complaint "put[s] [plaintiff] squarely within the Statute of Frauds."  Intertex Trading Corp. v. Ixtaccihuatl S.A. de CV, 754 F. Supp. 2d 610, 615-16 (S.D.N.Y. 2010) (cleaned up); FAC ¶ 26; Opp. at 13-14; see generally Agreement.  For instance, courts in this District regularly find that services such as conducting due diligence and financial analysis, developing "a general negotiating strategy," and "seek[ing] out and interact[ing] with potential sources of financing" fall within the scope of Section 5-701(a)(10).  Ely, 2013 WL 411348, at \*3 (internal citation omitted); see also Caro Cap., LLC, 2022 WL 463338, at \*7; Belotz v. Jefferies & Co., Inc., No. 98 Civ. 2587 (LAP), 1999 WL 587916, at \*2-3 (S.D.N.Y. Aug. 4, 1999), aff'd, 213 F.3d 625 (2d Cir. 2000) (holding that an agreement to pay compensation for services rendered in negotiating a business opportunity, including assistance with financial structuring, "put him squarely within

-13-

the scope of the Statute of Frauds"). Similarly, the analysis of potential strategic and financial partners is "easily encompassed" by the definition of "negotiating" under Section 5-701(a)(10). Gutkowski v. Steinbrenner, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010).

Moreover, the caselaw relied on by plaintiff is inapposite. In Akerson Advertising & Marketing, Inc. v. St. John & Partners Advert. & Pub. Rels., Inc., the court declined to apply Section 5-701(a)(10) because, unlike here, the contract at issue related to a direct sale between two parties, with no involvement of an intermediary negotiating a business opportunity. 89 F. Supp. 3d 341, 354 (N.D.N.Y. 2015). In Streit v. Bushnell, also cited by plaintiff, the court found the Statute inapplicable because the pleadings described "an employment contract that New York courts have held are not subject to" Section § 5-701(a)(10), rather than a contract providing for plaintiff's negotiation of a single business transaction. 424 F. Supp. 2d 633, 641-42 (S.D.N.Y. 2006). Similarly, in Riley v. N.F.S. Services, Inc., the court determined that the Statute did not apply because the plaintiff's role "was not limited to 'merely negotiating a business opportunity,'" but instead included serving and being compensated as an employee of defendant -- specifically, as a senior vice president. 891 F.

Supp. 972, 978 (S.D.N.Y. 1995) (citation omitted).  Plaintiff sets forth no such allegations.

Finally, in JF Capital Advisors LLC, the New York Court of Appeals affirmed a lower court's ruling that the plaintiff's performance of certain services that consisted of "inform[ing] defendants whether to partake in certain business opportunities" was not barred by the Statute of Frauds because it was not of an intermediary nature.  25 N.Y.3d at 766 (emphasis added).  The lower court had found that the Statute applied to all services except those that were "not later used to assist in the negotiation" of the business opportunity.  Id.; see also JF Cap. Advisors, LLC v. The Lightstone Grp, LLC, No. 651902/11, 2012 WL 5947827, at *1 (N.Y. Sup. Ct. Nov. 21, 2012) ("To the extent [the information plaintiff provided to help defendant better understand the opportunity] was not later used to assist in the negotiation or consummation of this investment opportunity, recovery under this claim is not prohibited by the statute of frauds.").  Tech+IP asserts that Tech+IP "advis[ed] BlackBerry concerning the relative advantages and disadvantages of the various proposals."  FAC ¶¶ 2, 106.  Here, there is no suggestion that defendant used plaintiff's analysis for anything other than negotiating a potential transaction, or in deciding whether to negotiate with certain

-15-

parties.  Thus, plaintiff fails to allege any services that would remove the Agreement from the reach of Section 5-701(a)(10).

### 2. **The Extension of the Agreement Was Not Reduced to Writing**

Having found that the Statute of Frauds applies to the Agreement, and also mindful of the no-oral-modification clause in the original and Amended Agreement,[6] we now turn to whether the purported extension of the Agreement was committed to a writing that satisfies the Statute.

"While a series of writings 'may be read together to satisfy the Statute of Frauds provided that they clearly refer to the same subject matter or transaction,' the combination of writings still must 'contain substantially the whole agreement and all its material terms and conditions.'" Ridenhour v. Bryant, No. 19 Civ. 2587 (ALC), 2020 WL 1503626, at *6 (S.D.N.Y. Mar. 29, 2020) (citation omitted).  Accordingly, "[c]ourts interpreting [Section 5-701(a)] have imposed four threshold requirements on adequacy," including the identification and description of the subject matter and the establishment of "either expressly or by reasonable implication," the essential terms of the agreement.  Zhi Zhong Qiu, 2020 WL 978352, at *3.  In the context of a breach of contract

---

[6] New York General Obligation Law § 15-301(1) provides that "a written agreement that expressly states that it can be modified only in writing cannot be modified orally."  Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 522 (2d Cir. 1990).

claim under the Statute of Frauds, the absence of a writing that "contains the . . . scope of services [and] duration . . . is fatal." Wolet Cap. Corp., 2021 WL 242297, at *8; see also Yarusi v. S. Sedghi Inc., No. 14 Civ. 7963 (NRB), 2015 WL 4772761, at *4, 7 (S.D.N.Y. Aug. 13, 2015) ("To satisfy the Statute of Frauds . . ., the duration may not be oral or implied; it must be evidenced in writing" (citing Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 54 (1953)).

Here, Tech+IP alleges that the email exchange described above, supra 17, committed the extension to writing as required by the Statute. ECF No. 44-2. At oral argument, and consistent with the allegations in the First Amended Complaint, plaintiff's counsel explained that it relies primarily on the following sentence in Tech+IP's December 31, 2022 email to BlackBerry: "As you say, we are all invested in this, and as discussed are fine operating on the understanding that our engagement has been extended until this can occur." Id.; Oral Argument at 12:11-19; FAC ¶ 62. Plaintiff also argues that the writing specifies the extension's duration as "until this" -- i.e., any transaction -- "can occur." ECF No. 44-2; FAC ¶ 61-63.

These allegations fall far short of what is required to establish the existence of a contract that satisfies the Statute of Frauds. While "[w]ritings may . . . serve their function by

-17-

merely describing, rather than completely formulating, the essential terms and conditions of the agreement," Opp. at 12 (quoting Zhi Zhong Qiu, 2020 WL 978352, at *5), this email exchange critically lacks the essential terms of the scope (namely, whether the extension applied only to a transaction with Catapult, or to any transaction with a Contacted Party) or the duration of the services covered by the extension, see Foros Advisors LLC v. Digital Globe, Inc., 333 F. Supp. 3d 354, 364 (S.D.N.Y. 2018) (finding that alleged writing failed to satisfy the Statute of Frauds because it did "not include . . . the scope of [plaintiff's] responsibilities."). This lack of specificity is fatal and stands in sharp contrast to the December 2021 written Amended Agreement.

Even assuming, arguendo, that the emails could be read to constitute a contract, and reading them in the most generous light to Tech+IP, the extension would be limited to a duration of four weeks and the closing of a deal with Catapult.[7] Such an extension simply bears no relation to the claim being made here.[8] Accordingly, because the emails fail to "establish[] the basic,

---

[7] It is clear from the email exchange that the parties were discussing work being done to finalize a transaction with Catapult only. ECF No. 44-2.

[8] Under this reading, the term of Amended Agreement would only have been extended to early February 2023 -- months before the Malikie deal closed on May 11, 2023. The email exchange also makes no mention of a tail period. Thus, even this overly generous reading would not have yielded plaintiff recovery on the Malikie deal.

underlying contractual commitment" made by BlackBerry, they fail to satisfy the Statute of Frauds. <u>Transition Invs., Inc. v. The Allen O. Dragge, Jr. Family Tr.</u>, No. 11 Civ. 4775 (AJN), 2012 WL 1848875, at *8 (S.D.N.Y. May 21, 2012).

### 3. Plaintiff Fails to Plead an Exception to the Statute of Frauds

#### i. The Part Performance Exception

Plaintiff seeks to rely on the doctrine of part performance to excuse compliance with the Statute of Frauds. Plaintiff's reliance on part performance is to no avail.

"The New York Court of Appeals has 'firmly stated' that there is no part performance exception to § 5-701(a)(10) of New York's statute of frauds." <u>Duckett v. Hadley Engelhard, Esq.</u>, No. 15 Civ. 8645 (RJS), 2017 WL 512455, at *3 (S.D.N.Y. Feb. 6, 2017) (internal citation omitted)); <u>see also</u> <u>CMC Transaction Servs., LLC v. IDEX Corp.</u>, 18 Civ. 4925 (PAC), 2019 WL 3496643, at *3 (S.D.N.Y. Aug. 1, 2019); <u>Castellotti v. Free</u>, 138 A.D.3d 198, 203 (App. Div. 2016) ("the partial performance exception . . . has not been extended to § 5-701"). Plaintiff does not even attempt to dispute this premise in its opposition memorandum. Opp. at 15-16. Thus, having found that Section 5-701(a)(10) governs the Agreement,

plaintiff's alleged performance under the oral modification cannot exempt the Agreement from the Statute.[9]

### ii. The Equitable Estoppel Exception

Plaintiff also invokes the doctrine of equitable estoppel to avoid the Statute of Frauds. Equitable estoppel applies "when one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that any modification be in writing." Towers Charter & Marine Corp., 894 F.2d at 522. As with part performance, the conduct claimed under equitable estoppel must be "unequivocally referable" to the oral modification. Id.

Equitable estoppel "is an extraordinary remedy" that "should be invoked sparingly and only under exceptional circumstances." JPMorgan Chase Bank, N.A. v. Freyberg, 171 F. Supp. 3d 178, 185–

---

[9] Even if Section 5-701(a)(10) did not apply to this contract, the Agreement nevertheless contained a no-oral-modification clause. A contractual prohibition against oral modification generally may be waived by showing part performance. Rose v. Spa Realty, 366 N.E.2d 1279, 1281 (N.Y. 1977). However, the part performance must be "unequivocally referable to the oral modification." Id. "Where the conduct is reasonably explained by the possibility of other expectations, including preparatory steps taken with a view toward consummation of an agreement in the future, it does not satisfy this standard." Microbanc, LLC v. InspireMD, Inc., No. 16 Civ. 3860 (LTS), 2018 WL 522335, at *4 (S.D.N.Y. Jan. 22, 2018) (internal quotation marks and citation omitted) (for this reason, holding that plaintiff's continued role as a broker after the expiration of the agreement was not unequivocally referable to the alleged oral extension); see also CMC Transaction Servs., LLC, 2019 WL 3496643, at *3. Indeed, the facts of this case, especially plaintiff's efforts to make an investment in the Catapult deal, well-illustrate this concern that a broker might be motivated to partially perform in anticipation of receiving future compensation or as "preparatory steps" taken in the hopes of consummating a new agreement. Plaintiff has not advanced any arguments to the contrary. Opp. at 15-16.

86 (S.D.N.Y. 2016) (internal citations omitted). Moreover, "[t]he burden of proof weigh[s] heavily on the party asserting the doctrine of equitable estoppel, since the Statute of Frauds is not easily avoided." Nasso v. Bio Reference Labs., Inc., 892 F. Supp. 2d 439, 449 (E.D.N.Y. 2012) (internal quotation marks and citation omitted).

In addition, a party may not invoke equitable or promissory estoppel claims in New York unless that party has suffered "unconscionable injury and loss." Am. Bartenders Sch. v. 105 Madison Co., 59 N.Y.2d 716, 718 (1983); see also CMC Transaction Svcs, LLC, 2019 WL 3496643, at *4. An "unconscionable injury" is an "injury beyond that which flows naturally . . . from the non-performance of the unenforceable agreement." Merex A.G. v. Fairchild, 29 F.3d 821, 826 (2d Cir. 1994); Robins v. Zwirner, 713 F. Supp. 2d 367, 377 (S.D.N.Y. 2010) (unconscionable injury is that which is "greater . . . than one that is both predictable and, to a certain degree, the consequences of the [p]laintiff's own choices."). Courts regularly reject estoppel claims consisting of alleged injuries such as "lost profits, lost fees, forgone business opportunities or damage to business reputation" without the showing of egregious circumstances. Darby Trading Inc. v. Shell Int'l Trading & Shipping Co., 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008); see also Ellis v. Provident Life & Accident

Ins. Co., 3 F. Supp. 2d 399, 410-11 (S.D.N.Y. 1998) (it is well established under New York law that lost fees are not "unconscionable injuries" for purposes of circumventing the Statute of Frauds); Kubin v. Miller, 801 F. Supp. 1101, 1122 (S.D.N.Y. 1992) ("The loss of a finder's fee . . . is not generally classified as unconscionable").

Without needing to reach whether plaintiff has adequately pled the other elements of equitable estoppel, the Court finds that "not even the most liberal construction can transform the harm [plaintiff] allegedly suffered into the sort of 'unconscionable injury and loss' that would support application of equitable estoppel." Mtivity, Inc. v. Off. Depot, Inc., 525 F. Supp. 3d 433, 442 (E.D.N.Y. 2021). In the First Amended Complaint, plaintiff alleges injury based on defendant's refusal to pay the transaction fee invoice. FAC ¶¶ 109, 111; id. at 21-22.[10]  In its opposition, Tech+IP simply argues that its continued work after the Amended Agreement's expiration date based on BlackBerry's "inducement . . . to rely on an oral modification" is "sufficient" to preclude BlackBerry's Statute of Frauds defense at the motion to dismiss stage. Opp. at 15. Not only is this proposition

---

[10] In its prayer for relief, Tech+IP seeks "damages in an amount to be determined at trial but not less than . . . the amount of the invoice sent . . . and due . . . as a result of BlackBerry closing the transaction with Malikie—plus any future Transaction Fees." FAC at 21. The only other relief Tech+IP specifically seeks is interest and applicable fees and costs. Id.

unfounded, see CMC Transaction Servs., 2019 WL 3496643, at *5 ("[i]t is proper to dismiss the cause of action due to lack of an unconscionable injury on the pleadings alone"); Komlossy v. Faruqi & Faruqi, LLP, 15 Civ. 9316 (KPF), 2017 WL 722033 (S.D.N.Y. Feb. 23, 2017), but, even construing the facts in the light most favorable to plaintiff, defendant simply broke an oral promise to pay plaintiff a transaction fee in the event that a certain transaction closed.  As discussed above, this is precisely the type of injury that courts consistently decline to find unconscionable.

Given plaintiff's failure to identify any injury beyond that of a lost transaction fee, no exceptions to the Statute of Frauds have been pled and plaintiff's breach of contract claim is dismissed.

**B.    Breach of the Implied Covenant of Good Faith and Fair Dealing**

Tech+IP also alleges that BlackBerry breached its duty of good faith and fair dealing by "misle[ading] Tech+IP into believing that the Agreement was extended and that Tech+IP would be compensated for its work."  Opp. at 17; FAC ¶ 115.  Defendant moves to dismiss this claim, arguing that it duplicates plaintiff's breach of contract claim and that plaintiff failed to identify any

implied obligations under the Agreement that would give rise to such a claim.

The covenant of good faith and fair dealing is "[i]mplicit in every contract," Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc., 949 N.Y.S.2d 115, 118 (2012), and "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," Fleisher v. Phoenix Life Ins. Co., 858 F. Supp. 2d 290, 298-99 (S.D.N.Y. 2012) (citation omitted).  To avoid redundancy, claims of breach of the implied covenant must be premised on a distinct set of facts from those underlying a claim for breach of contract.  Deutsche Bank Sec., Inc. v. Rhodes, 578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008).  Therefore, a "claim for breach of the implied covenant of good faith and fair dealing can be maintained simultaneously with a breach of contract claim 'only if the damages sought by the plaintiff[s] for breach of the implied covenant are not intrinsically tied to the damages allegedly resulting from breach of contract.'"  Vysyaraju v. Mgmt. Health Sols., Inc., No. 12 Civ. 4420 (JGK), 2013 WL 4437236, at *11 (S.D.N.Y. Aug. 19, 2013) (citation omitted).

The Court agrees with BlackBerry that Tech+IP's breach of implied covenant of good faith and fair dealing claim is duplicative of its breach of contract claim.  Stripped of its

-24-

conclusory references to BlackBerry's "misl[eading]" conduct, FAC ¶ 115; see also id. ¶ 70, Tech+IP's claim ultimately alleges that BlackBerry failed to pay a transaction fee in violation of the express terms of the parties' agreement. Tech+IP points to no specific facts to support its claim that defendant violated the implied covenant. In fact, plaintiff's allegations suggest the opposite, describing numerous instances in which the parties discussed formalizing various amendments to the Agreement. See FAC ¶¶ 57, 72, 76. The parties -- who had previously extended the Agreement formally in writing as contemplated by the Agreement, id. ¶ 39 -- simply failed to do so a second time. Because plaintiff has not alleged specific conduct beyond that which would constitute a breach of contract (i.e., defendant's failure to pay the transaction fee), plaintiff's breach of implied covenant claim must be dismissed as duplicative.[11]

## C.    Unjust Enrichment and Quantum Meruit Claims

Finally, plaintiff pleads in the alternative that it is entitled to recover from defendant under the theories of unjust enrichment and quantum meruit. Defendant seeks the dismissal of

---

[11] We need not address defendant's other arguments concerning plaintiff's claim for breach of the covenant of good faith and fair dealing given plaintiff's failure to dispute them. See In re UBS AG Sec. Litig., No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012), aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173 (2d Cir. 2014) (recognizing that a party "concedes through silence" arguments by its opponent that it fails to address).

these claims because they are (1) barred by the Statute of Frauds;
(2) duplicative of the breach of contract claim; and (3)
insufficiently pled.  Mot. at 21.  The Court agrees.

Under New York law, quantum meruit and unjust enrichment
claims may be considered together as a "single quasi contract
claim." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine
Host Corp., 418 F.3d 168, 175 (2d Cir. 2005) (citation omitted).
However, "[t]he existence of a valid contract precludes quasi-
contract claims, because they serve as equitable remedies that
operate where no valid contract exists." Rojo v. Deutsche Bank,
No. 06 Civ. 3574, 2010 WL 2560077, at *6 (S.D.N.Y. June 23, 2010),
aff'd, 487 F. App'x 586 (2d Cir. 2012); see Clark-Fitzpatrick,
Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388 (1987) ("The
existence of a valid and enforceable written contract governing a
particular subject matter ordinarily precludes recovery in quasi
contract for events arising out of the same subject matter.").

Moreover, "[i]t is well settled that under New York law a
plaintiff may not escape the Statute of Frauds by attaching the
label 'quantum meruit' or 'unjust enrichment' . . . to the
underlying contract claim." Morgenweck v. Vision Cap. Advisors,
LLC, 410 F. App'x 400, 402 n.1 (2d Cir. 2011) (citations omitted);
see also Snyder v. Bronfman, 13 N.Y.3d 504, 506 (2009) (quasi-
contract claims seeking to recover "the value of plaintiff's

services in helping to achieve a corporate acquisition are barred by . . . § 5-701(a)(10).").  "[B]oth breach of contract and quasi-contract claims based upon a purported agreement to pay compensation for the negotiation of a corporate acquisition will fail if they do not satisfy the Statute of Frauds."  Wolet Cap. Corp., 2021 WL 242297, at *10.  Indeed, "courts have dismissed quantum meruit claims under the Statute of Frauds where the writings relied upon failed to establish that the defendant actually agreed to pay a finder's fee, or where the writings left ambiguity as to whether the agreement's terms covered the transaction upon which a fee was claimed."  Springwell Corp., 16 F. Supp. 2d at 305-06 (collecting cases).

Although there are certain cases where a writing may support a quasi-contract claim, but not a breach of contract claim, premised on an alleged contract subject to the Statute of Frauds, this is not one of them.  In order to plead a quasi-contract claim for services rendered in the negotiation of the sale of a business, a plaintiff must plead the existence of a writing that "evidence[s] the fact of plaintiff's employment by defendant to render the alleged services."  Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 575-76 (1969); see also Chapman, Spira & Carson, LLC v. Helix BioPharma Corp., 982 N.Y.S.2d 93, 95 (1st Dept. 2014) (although emails "fail[ed] to make any reference to payment terms, and

-27-

accordingly fail[ed] to satisfy the statute of frauds as to the contract claim," the writings "suffice[d] to show that [defendant] employed plaintiff" and thus satisfied the Statute for purposes of plaintiff's quantum meruit claim).  The writing "must at a minimum" identify "the parties to the transaction, the fact of plaintiff's employment, [and] the subject matter of the transaction.'"  Wolet Cap. Corp., 2021 WL 242297, at *11 (cleaned up) (internal quotation marks and citations omitted).

At the outset, plaintiff's quasi-contract claims are dismissed to the extent that they "duplicate" its breach of contract claims.  Thus, any services plaintiff rendered on or before the expiration of the Amended Agreement's tail period on December 31, 2022 cannot form the basis of plaintiff's unjust enrichment and quantum meruit claims, as the Amended Agreement, including the tail period, was still valid and enforceable.

As for the quasi-contract claims relating to services provided under the alleged extension, the Court must determine whether the December 31, 2022 and January 1, 2023 emails constitute a memorandum sufficient to evidence defendant's engagement of plaintiff to render services thereafter.  As discussed in the context of plaintiff's contract claim, supra 17-18, the alleged communications do not describe services of a "defined scope or duration."  Wolet Cap. Corp., 2021 WL 242297, at *12.  Most

notably, the alleged emails are ambiguous as to whether the parties (1) extended the Agreement for more than four weeks, and (2) limited the extension to a transaction with Catapult, as they did for at least a part of the Amended Agreement.    See Amended Agreement § 1.    Accordingly, plaintiff's quasi-contract claims fail to satisfy the Statute of Frauds and must be dismissed.

## CONCLUSION

For the reasons stated above, defendant's motion to dismiss is granted and the case is dismissed.    The Clerk of the Court is respectfully directed to terminate the motion pending at ECF Nos. 27, 33.    Moreover, the parties are directed to refile the First Amended Complaint and the motion to dismiss briefing in accordance with the Court's direction on sealing within two weeks of the filing of this Memorandum and Order.


**SO ORDERED.**


Dated:    September 12, 2024
          New York, New York

                                    _____
                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE